IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:25-cr-000108-CRC |
| LEVITA FERRER, | |
| *Defendant*. | |

## LEVITA FERRER'S POSITION ON SENTENCING

Levita Ferrer stands before the court for sentencing as a 65-year-old first-time offender with no criminal history. Ms. Ferrer entered a guilty plea to one count of theft of government property in violation of 18 U.S.C. § 641 for stealing money from her employer (the U.S. Department of State) to feed a debilitating gambling addiction. As expressed in her letter to the Court,[1] Ms. Ferrer accepts full responsibility and is deeply remorseful for her criminal conduct. For purposes of sentencing under 18 U.S.C. § 3553(a), however, this crime must be viewed within the larger context of Ms. Ferrer's otherwise law-abiding, honest, and productive life. Most importantly, Ms. Ferrer dedicated her career to serving this country, first through 26 years in the United States Navy and then another 10 years as a civilian for the Department of State. Her criminal offense notwithstanding, the positive impact Ms. Ferrer has had on those around her is evident from the letters that friends and former colleagues have written to the Court.

Ms. Ferrer's serious, but anomalous, offense is largely the result of her struggle with a gambling addiction. To be clear, Ms. Ferrer does not raise her gambling addiction as an excuse

---

[1] Ms. Ferrer's Letter to the Court is attached as Attachment 1.

for her crime. It is not. However, it does provide context as to the nature and circumstances of Ms. Ferrer's crime.

Moving forward, Ms. Ferrer is committed to making amends and paying restitution. Ms. Ferrer had hoped to make full restitution prior to her sentencing. However, due to her incarceration in DC Jail since June 2, 2025, and the added difficulty of trying to sell residential properties while they have current tenants, Ms. Ferrer could not liquidate her assets in time to pay the restitution prior to sentencing.[2] This is a case in which Ms. Ferrer continues to believe she can make full restitution, even if the restitution is paid soon after her sentencing.

Ms. Ferrer respectfully asks this Court to fashion a sentence that will account not only for the serious nature of her crime but also the impact that incarceration will have on Ms. Ferrer's health, on her ability to access treatment towards her gambling addiction, ███████████████████████

█████████████████████████████████████████████

Ms. Ferrer has dedicated more than three decades of service to this country. It is a tragedy that her many years of public service have ended this way. For the reasons set forth herein, we respectfully submit that a sentence of time served combined with a period of supervised release conditioned on addiction treatment and restitution, is sufficient, but not greater than necessary, to achieve the purposes of federal sentencing in this case.

## I.    THE ADVISORY SENTENCING GUIDELINES RANGE

Ms. Ferrer agrees with the calculation of the Pre-Sentence Report ("the PSR") of the Sentencing Guidelines in this case. The PSR concluded that Ms. Ferrer's Offense Level was 15

---

[2] Ms. Ferrer is continuing her efforts to sell her real estate properties. Undersigned counsel will coordinate any asset sales with the Government to ensure the Government has no objection to sales and that the sales are conducted with the objective of obtaining fair market value for the property.

with a Criminal History Category of I, which together result in an advisory Sentencing Guidelines range of 18 to 24 months of incarceration.

However, calculating the advisory Guidelines range is only the first step in the federal sentencing process. *See Gall v. United States*, 552 U.S. 38 (2007). After calculating the advisory Guidelines range, the Court must first determine whether to apply any Guidelines-based departures to adjust the applicable Guidelines range. *Id*. Once the final advisory Guidelines range is determined, the Court then must consider the factors set forth in 18 U.S.C. § 3553(a) and decide whether the circumstances and features of the case and the defendant before it warrant a variance[3] from the Guidelines. *Id*.

For all the reasons discussed below, we submit that these factors support a sentence of time served combined with a period of supervised release conditioned on addiction treatment and restitution.

## II.     18 U.S.C. § 3553(a) FACTORS

In the post-*Booker* era in which the Sentencing Guidelines are advisory and not mandatory, the sentencing court's duty is to consider all of the factors identified in 18 U.S.C. § 3553(a) and "impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in the statute. Pursuant to the statute, the sentence imposed must: (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (2) afford adequate deterrence to criminal conduct; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). In addition, § 3553(a) requires the

---

[3] As the Court is aware, the Probation Office has also recommended a downward variance and that the Court impose a sentence of time served based on many of the factors addressed in this memorandum. *See* Probation Office's Sentencing Recommendation, ECF No. 25.

sentencing court to consider the following factors (in addition to the advisory Guidelines range and any pertinent policy statements issued by the Sentencing Commission) in imposing a sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to victim(s). 18 U.S.C. § 3553(a)(1)-(7). We submit that these statutory factors further support the sentence requested by Ms. Ferrer.

### A.  The Nature And Circumstances Of The Offense

The nature and circumstances of Ms. Ferrer's offense are accurately reflected in the statement of facts included as part of the plea agreement and in the offense conduct portion of the PSR. Over a two-year period, Ms. Ferrer misappropriated $657,347.50 in State Department funds to herself.  Ms. Ferrer accepts full responsibility for her conduct.  For purposes of calculating a sentence that is "sufficient but not greater than necessary" to serve the purposes of federal sentencing, we first ask the Court to consider the broader circumstances surrounding Ms. Ferrer's offense, specifically the role that Ms. Ferrer's serious gambling addiction played in the offense.

Ms. Ferrer was not a gambler for most of her life. She first visited a casino approximately 22 years ago at the age of 43 and did not develop a gambling addiction until years later. During the COVID-19 pandemic, Ms. Ferrer began to gamble more frequently as a coping mechanism for a stressful world and work environment. As Ms. Ferrer's casino visits increased during the pandemic, her gambling habit spiraled into a debilitating addiction. Ms. Ferrer began to visit the casino every week (often multiple times in the same week) and gambled approximately $30,000 per month on slot machines. At times, she would win significant sums of money, including her largest winning of $196,000 in a single night.  But the "highs" from winning only fed her addiction,

and her gambling losses significantly outpaced her winnings. All told, Ms. Ferrer believes she lost approximately $900,000 between 2021 and 2024, which includes the illegal proceeds from the instant offense as well as a significant portion of her life savings as a now 65-year-old retired veteran.

Ms. Ferrer's gambling addiction is a critical element of answering the "why" question in this case. Why would a law-abiding, honest, and hard-working person like Ms. Ferrer betray her employer and jeopardize her future as well as her liberty to commit this offense? Put simply, research shows that gambling addictions are real and that they impair an individual's ability to make rational decisions and lead otherwise law-abiding individuals to commit crime.

In 1980, the American Psychiatric Association ("APA") first recognized pathological gambling as a mental disorder, classifying it as an "impulse control disorder." More recently, in 2013, the APA reclassified gambling disorder as an addiction-related disorder based on significant research that pathological gambling and substance addiction affect similar areas of the brain in similar ways. An article on the topic states:

> Brain imaging and neurochemical tests have made a "pretty strong case that [gambling] activate[s] the reward system in much the same way that a drug does." . . . . Gamblers report cravings and highs in response to their stimulus of choice . . . . Research has shown that problem casino gamblers show increases in heart rate and salivary stress hormones as well as blood levels of norepinephrine compared with non-problem gamblers. The former also show increases in dopamine, the key player in the brain's "reward circuit." [Moreover,] brain-imaging studies show that when exposed to gambling videos, problem gamblers' brains show "important similarities" to changes in the brains of cocaine addicts when viewing a video about cocaine.

C. Holden, *Behavior Addictions Debut in The Proposed Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-V),* SCIENCE, February 2010 at 935; *see generally* Nat. Ctr. for Responsible Gambling, *Gambling and the Brain: Why Neuroscience Research is Vital to Gambling Research* (2011).

The Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-V") defines gambling disorder as "persistent and recurrent problematic gambling behavior leading to clinically significant impairment or distress." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 1248 (5th ed. 2013). Among its characteristics are: (i) preoccupation with gambling; (ii) chasing one's losses (gambling more money on more risky bets in an effort to recoup losses); (iii) lying to conceal the extent of gambling; (iv) jeopardizing one's job or career opportunity; and (v) relying on others to provide money to relieve desperate financial situations caused by gambling. *Id*. The authors write:

> The essential feature of gambling disorder is persistent and recurrent maladaptive gambling behavior that disrupts personal, family, and/or vocational pursuits . . . . A pattern of "chasing one's losses" may develop, with an urgent need to keep gambling (often with the placing of larger bets or the taking of greater risks) to undo a loss or series of losses . . . . Although many gamblers may "chase" for short periods of time, it is the frequent, and often long-term, "chase" that is characteristic of gambling disorder . . . . ***Individuals may lie to family members, therapists, or others to conceal the extent of involvement with gambling; these instances of deceit may also include, but are not limited to, covering up illegal behaviors such as forgery, fraud, theft, or embezzlement to obtain money with which to gamble . . . . Individuals may also engage in "bailout" behavior, turning to family or others for help with a desperate financial situation that was caused by gambling.***

*Id*. at 586 (emphasis added). Gambling patterns "may be regular or episodic and gambling disorder can be persistent or in remission," but it is typically a progressive disease. *Id*. at 587.

Gambling disorders involve multiple stages. *See* Darren Gowen & Jerri B. Speyerer, *Compulsive Gambling and the Criminal Offender: A Treatment and Supervision Approach*, 59 Fed. Prob. 36 (Sept. 1995). The first stage, progression, is when the gambler is unable to stop gambling. She must spend more time and money gambling to achieve the same excitement. In the second phase, intolerance, the gambler starts to hide the amount and frequency of her losses, and experiences nearly uncontrollable urges to gamble to win back lost money. The third stage, preoccupation, is characterized by continuous obsessive thoughts of gambling and the belief that

gambling will solve all problems. In the final stage, disregard for consequences, the gambler remains convinced that a "big win" will solve all problems, and disregards the negative consequences of her gambling, often engaging in illegal activities such as forgery, theft, and embezzlement.

In late 2003, without explanation, the Sentencing Commission issued a policy statement that "[a]ddiction to gambling is not a reason for a downward departure." U.S.S.G. § 5H1.4. Prior to this pronouncement, several federal courts found that "a pathological gambling disorder, if proven . . . to have resulted in a significantly reduced mental capacity contributing to the commission of the offense of conviction, [could] qualify . . . as a form of 'diminished capacity' under §5K2.13," and warrant a downward departure. *United States v. Harris*, 1994 WL 683429, at *4 (S.D.N.Y. Dec. 6, 1994) (collecting cases). For example, in *United States v. Liu*, 267 F. Supp. 2d 371 (E.D.N.Y. 2003), the Court granted a 4-level downward departure, "leading to imposition of the minimum sentence permitted," based on the defendant's pathological gambling addiction, which "interfered with [his] ability to control behavior that he knew was wrongful." *Id*. at 375. In *United States v. Checoura*, 176 F. Supp. 2d 310 (D.N.J. 2001), the Court granted a downward departure to a compulsive gambler and noted that the defendant "did not choose to gamble compulsively, any more than other compulsives choose . . . to wash their hands after touching every doorknob." *Id*. at 314.

The change in policy in the Sentencing Guidelines was a response to the PROTECT Act, in which Congress directed the Commission "to ensure that the incidence of downward departures [was] substantially reduced." Appendix C, amendment 651. The PROTECT Act was widely criticized for "shuck[ing] the wisdom . . . and breadth of experience accumulated by judges" in fashioning individualized sentences. *United States v. Mellert*, 2003 WL 22025007, at *2 (N.D.

Cal. July 30, 2003); *see also* J. Martin, Jr., *Let Judges Do Their Jobs*, N.Y. TIMES, June 24, 2003, (describing the Act as "completely at odds with the sentencing philosophy that has been a hallmark of the American system of justice").

Since *Booker*, the Sentencing Guidelines advisory § 5H1.4's policy statement is not binding on a sentencing judge. *See United States v. Jones*, 460 F.3d 191, 194 (2d Cir. 2006) ("the Guidelines limitations on the use of factors to permit departures are no more binding on sentencing judges than the calculated Guidelines ranges themselves"); K. Stith, *The Arc of the Pendulum: Judges, Prosecutors and the Exercise of Discretion*, 117 Yale L.J. 1420, 1482-83 (2008) (*Booker* "transmuted from 'law' to 'advice' all of the departure-reducing Guidelines amendments that the Sentencing Commission had promulgated pursuant to the [PROTECT Act]"). Section 5H1.4 is especially unworthy of deference because it was not the product of expert consideration. *See Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (where the Commission "did not take account of 'empirical data and national experience,'" the Guidelines should command little respect).

Further, post-*Booker*, Courts have granted downward variances from the advisory Guidelines range based on the diminished capacity that can result from a gambling addiction. In *United States v. Dikiara*, 50 F. Supp. 3d 1029 (E.D. Wis. 2014), the defendant embezzled more than $1 million from her employer and "gambled away virtually all of the proceeds of her crime at [a] casino." *Id*. at 1030. The defendant's Guideline range was 41 to 51 months imprisonment. Before imposing a lesser sentence of 15 months, the Court noted: "By physically hijacking the brain, addiction diminishes the addict's capacity to evaluate and control his or her behaviors. Rather than rationally assessing the cost of their actions, addicts are prone to act impulsively, without accurately weighing future consequences." *Id*. at 1032 (quoting *United States v. Hendrickson*, No. CR 13-4110, 2014 WL 2600090, at *5 (N.D. Iowa June 11, 2024)). The Court

further explained that the "[d]efendant did not act out of a desire to harm her employer, nor did she steal in order to finance a lavish lifestyle. Virtually all of the money went to the casino. The records from the casino demonstrated substantial losses, which ate up not just the proceeds of the crime but also defendant and her husband's savings." *Id.*

In *United States v. Caspersen*, No. 1:16-cr-00414-JSR-1 (S.D.N.Y. 2016), the defendant defrauded friends and families of more than $38 million to feed a gambling addiction. The advisory Sentencing Guidelines range was 151 to 188 months of incarceration. Before imposing a sentence of four years, Judge Jed Rakoff commented that the defendant's gambling disorder "diminished his ability to make rational decisions." *Id.*, ECF No. 37 at 45 (Transcript of Sentencing Hearing). Judge Rakoff went on to explain that "[a]mong the most fundamental programs of our legal system when it comes to crime are that we distinguish between people who commit crimes because they have made a rational choice that they would rather do something antisocial and harmful to others in order to gain their material benefits or other benefits, and those who act with diminished capacity and who are to some degree not acting with a full deck." *Id.* at 46-47.

Some Courts and state legislatures have established special programs that recognize the diminished capacity of those suffering from a gambling disorder. In 2018, Nevada established its Gambling Treatment Diversion Court where non-violent offenders who commit crimes in "furtherance of a gambling addiction" can resolve their cases through diversion. (*See* Judge Cheryl Moss, Nevada's First Gambling Treatment Diversion Court: A Judge's Historical and Personal Perspective on Problem Gambling in the Court Room (Sept, 2019), available at https://nvbar.org/wp-content/uploads/16-Diversion-Court.pdf).

Due in part to the success of the Nevada Gambling Treatment Diversion Court, states such as Ohio have implemented problem gambling addition programs for non-violent offenders who

commit crimes because of their gambling disorders. (https://cp.cuyahogacounty.gov/court-resources/specialty-courtsprograms/problem-gambling-addiction-program/). Legislatures in New Jersey and Washington are considering their own gambling treatment diversion programs. (*See* NJ and WA Legislatures Working to Create Alternative Courts for Problem Gambling, Play USA (Jan. 26, 2024), available at https://www.playusa.com/news/treatment-courts-nj-wa-responsible-gambling). In New Jersey, members of the state Assembly and Senate introduced legislation to establish a pilot program for gambling treatment diversion courts. The Washington law is currently pending in committee in the Washington House of Representatives. (*See* Washington State Legislature, Bill status-at-a-glance for HB 1362-2025-26, An Act Relating to the creation of a gambling treatment diversion court pilot program to be conducted by the administrative office of the courts, available at https://app.leg.wa.gov/billsummary?BillNumber=1362&Year=2025).

　　　　Ms. Ferrer's gambling addiction does not excuse her crime. However, as these courts and legislatures have recognized, a defendant like Ms. Ferrer who succumbs to an addiction and commits a criminal act in furtherance of that addiction does not act rationally and is less culpable than defendants who are able to rationally weigh the consequences of their actions and nevertheless choose to commit a crime. Ms. Ferrer's diminished capacity supports a sentence of time served, with a period of supervised release conditioned on treatment for her addiction and restitution to the U.S. Department of State. Such a sentence will allow Ms. Ferrer to resume the gambling addiction treatment she desperately needs. *See* U.S.C. § 3553(a)(2)(D) (requiring the Court to consider the defendant's need for "medical care, or other correctional treatment in the most effective manner").

**B.  History And Characteristics Of The Defendant**

Next, Ms. Ferrer's personal history and characteristics support a sentence of time served combined with a period of supervised release. Ms. Ferrer's difficult upbringing, her 26 years of service in the United States Navy and 10 years of service with the Department of State, ███████ ████████████████████████████████████████████████████████████ and her own age and health all support a sentence of time served combined with a period of supervised release conditioned on addiction treatment.

*i.    Ms. Ferrer's difficult upbringing*

Other than the instant offense, Ms. Ferrer has lived a law-abiding and honorable life. She dedicated the last 36 years to a career in public service. Ms. Ferrer is extremely proud of her career and the opportunities she had to serve the United States, but her life and career were not a foregone conclusion. She had to work hard and overcome obstacles to even make it to the United States, to enlist in the United States Navy, and to obtain an education.

Ms. Ferrer was born on July 11, 1960, into a very poor family in the Philippines. Growing up, Ms. Ferrer's father worked as a heavy equipment operator and her mother as a salesclerk. When Ms. Ferrer was a child, she lived in a bamboo home without any furniture and limited belongings. From a young age, she and her siblings had to work to help financially support the family. At 16 years old, Ms. Ferrer managed to earn a scholarship to enroll in a boarding school.

In 1981, at the age of 21, Ms. Ferrer married her first husband and moved to the United States. Together they had Ms. Ferrer's only daughter. Unfortunately, Ms. Ferrer's first husband was physically and emotionally abusive.  In 1989, the abuse led Ms. Ferrer to talk to a Navy recruiter, who encouraged her to enlist in the Navy to escape the abuse. Days later, Ms. Ferrer dropped everything in her life to enlist in the Navy and left for basic training.

11

*ii.*    *Ms. Ferrer's nearly 36 years of public service*

1n 1989, Ms. Ferrer enlisted in the United States Navy.  In 1995, Ms. Ferrer was supporting financially both her young daughter and her mother, moving her mother from the Philippines to live with her. Ms. Ferrer financially supported her mother until her passing in 2011.

When Ms. Ferrer enlisted in the military she had only a high school education. But in 1995, while stationed in Japan, working fulltime for United States Navy, and supporting her daughter and mother, she began to pursue an associate's degree, which she completed in 1998.

In 2007, Ms. Ferrer took in her granddaughter when she was two years old and raised and financially supported her until she turned eighteen and enrolled in college. While Ms. Ferrer's daughter had moved out and was working, Ms. Ferrer's daughter did not have the financial means to support her child.  Ms. Ferrer went on to obtain two master's degrees while still working fulltime for the United States Navy and raising her granddaughter.

Over Ms. Ferrer's 26 years of service, she reached the rank of Senior Chief and served in a variety of roles, including Hospital Corpsman, Airman, Fireman, Medical Laboratory Technician, a Ship's 3-M System Coordinator, Instructor, Electrical and Mechanical Repairman, and other administrative roles.

Ms. Ferrer's service also required her to deploy around the world. After completing bootcamp in Pensacola, Florida, Ms. Ferrer was briefly stationed in Brooklyn, NY and Lexington Park, Maryland.  She then deployed to Japan for four years; followed by four years in Hawaii; four years in Bethesda, Maryland; four years aboard a ship off the coast of Italy; one year in New York, New York; and three years back in Bethesda, Maryland.  Ms. Ferrer's final assignment in her lengthy military career was a three-years deployment to the U.S. Embassy in Saudi Arabia.

Throughout her 26-year military career, Ms. Ferrer earned numerous awards and decorations, including the Defense Meritorious Service Medal, the Meritorious Service Medal, the

Navy & Marine Corps Commendation medal, the Joint Service Achievement Medal, the Navy & Marine Corps Achievement Medal, the Navy Meritorious Unit Commendation, the Navy "E" Ribbon, the Navy Good Conduct Medal, the National Defense Service Medal, the Global War on Terrorism Service Medal, the Military Outstanding Volunteer Service Medal, the Sea Service Deployment Ribbon, the Navy & Marine Corps Overseas Service Ribbon, the Navy Pistol Marksman Ribbon, and the Enlisted Surface Warfare Specialist Insignia.

These 26 years of service also left a toll on Ms. Ferrer's physical well-being. The military considers Ms. Ferrer 100% service-connected disabled. The wear and tear on her body from years of service, have left her with work induced migraines, lower-back pain, carpel tunnel syndrome, rheumatoid arthritis, and degenerative arthritis.

Two months after retiring from the military, Ms. Ferrer joined the Department of State as a civilian. Ms. Ferrer worked directly for the Department of State from June 1, 2015, until April 20, 2024, followed by another year (until March 28, 2025) as a contractor. She held positions as a Budget Analyst, a Senior Budget Analyst, and a Budget and Program Analyst for the departments of Diplomatic Security, Office of Chief of Protocol, and Office of Cooperative Threat Reduction.

Ms. Ferrer's work ethic, integrity, and law-abiding character are clearly reflected in the letters written to the Court by Ms. Ferrer's family, friends and co-workers who know her best, all of which are consolidated as Attachment 2. In addition to describing Ms. Ferrer's fundamentally good character, these individuals also recount the sincere remorse that Ms. Ferrer has expressed for the criminal conduct that brings her before the Court.  We offer a few excerpts from these letters and invite the Court to read them in their entirety.

Veronica Landy Ten Eyck, an employee at Veteran Affairs, active member of the American Legion, Yellow Ribbon Fund, and court Appointed Special Advocate for girls aging out of foster care, writes:

> Over the years, I have come to know Levita, not only as a dedicated Navy Veteran and public servant, but also as a woman of deep character, resilience, and generosity. She has always been someone who shows up for others, whether through volunteering her time, supporting friends and colleagues or caring for her family.
>
> What has always stood out to me most about Levita is her sense of loyalty and service. Even after her 25+ years in the Navy, she continued to find ways to serve her country and community. I have witnessed firsthand her commitment to others and her ability to inspire trust and compassion.
>
> . . .
>
> While I know she is now facing the consequences of her actions I also know that this situation does not erase the many positive contributions she has made in her life. Levita has expressed genuine remorse and a desire to grow from this experience, I believe she has the strength and character to rebuild and continue to be an asset to her community.

Mirasol G. Smith, a friend of Ms. Ferrer for 33 years, writes:

> Over the course of our long friendship, I have come to know [Levita] as a person of great kindness, generosity, and integrity.
>
> Levita is a devoted grandmother to two exceptional grandchildren who view her as a role model. She was born and raised in the Philippines by a single mother alongside two siblings and, through hard work and perseverance, overcame significant challenges to build a life here in the United States. Her journey is an inspiring example of resilience and determination, and I am proud to call her my best friend.
>
> I am fully aware of the seriousness of her current criminal case. I can attest that Levita has expressed profound remorse for her actions and is committed to making amends. I believe this incident does not define her character, but rather stands as an isolated lapse in judgment in an otherwise honorable life.
>
> Your Honor, I respectfully and humbly ask that you consider her decades of integrity, dedication to her family, and commitment to bettering herself when determining her sentence. I truly believe that Levita has the strength of character to learn from this experience and to continue being a positive influence in her family and community.

Cathy Preyer-Briggs, a friend and former colleague of Ms. Ferrer at the Department of State, writes:

> People there in the office like her a lot; she was easy to like. She was easy to approach and was always very open, thoughtful and caring to those she worked with. Ms. Ferrer was a dedicated hard-working employee. The work she did was very stressful and required her to be available long hours even when on leave. There was never a question when she went on vacation her laptop was always with her. The volume of work was heavy and always required attention. She was always determined to make sure all the work was completed on time and everyone got what they needed to do their jobs.
>
> I recalled how she would speak up for a co-worker that had been denied an award for recognition of service. Because of Ms. Ferrer's efforts in pointing out the oversight, that employee was recognized and was given an award for her service.
>
> I observed how much Ms. Ferrer loved and cherished her family. They are the center of her universe. She was concerned for them and wanted to make sure they got what they needed. I recalled her talking about how she was required to support her family members that lived in the Philippines. She never complained about it, she always spoke lovingly about her family.

Clifford G. Hunt, another friend and former colleague of Ms. Ferrer's at the Department of State, writes:

> While I am aware of the serious charges she is facing, I respectfully ask the Court to consider her otherwise commendable record of service and integrity. Throughout her tenure, Levita demonstrated a deep commitment to public service and earned the respect of her peers. She approached her work with diligence and took pride in upholding the standards expected of federal employees.
>
> It is also my understanding that during the time in question, she faced significant and unexpected personal responsibilities. Her daughter and two young grandchildren came to live with her, placing a heavy emotional and financial strain on her household. That pressure doesn't excuse mistakes, but it adds context to a situation that may otherwise appear one-dimensional.
>
> Despite this, I continue to believe that Levita is a fundamentally good and trustworthy person. I respectfully ask that you consider the full picture of her life and her service when making decisions about her future.

Kelly Francois, another friend and former colleague of Ms. Ferrer's during her deployment to Saudi Arabia writes:

We worked numerous VIP visits to include CODELL visits, President Obama . . . and other high-ranking visitors to the Kingdom of Saudi Arabia. We spent a lot of time with the arrival and departure of VIPs to ensure an outstanding visit every time. Levita was recognized for her hard work by each VIP who would present their coin after their visit, for a job well done!

We worked together on these visits to ensure they went without any problems. It takes a hard-working person to do this job, one who is willing to work at all hours of the day and night. I just knew Levita was dedicated to do the right things to make each visit a success!

Her dedication to each planned movement of a VIP took hard work, often times under occasional difficult circumstances. She dedicated her years to outstanding service of a perfect Sailor and then Civil Service worker!

Levita was always professional and spent many hours arranging the arrivals and departures of all visitors to the Kingdom. She truly loved her job!

Finally, Ms. Ferrer's husband, Jason Brezovic, who himself is an active-duty Naval Officer who has served for the last 37 years, writes:

The qualities in her that I admire the most would strongly center around: dedication, caring, honesty, integrity, loving, sincerity and hardworking. She worked full-time and went to school at night, raising a child and grandchildren while caring for her elderly mother (until her stroke and she needed full-time care). She also supports her brother's and sister's families who are unable to come to the United States. She always maintained a positive attitude while working through life's challenges and completed an Associate's/Bachelor's and 2 master's Degrees while working full-time.

. . .

I would sincerely ask for leniency for Levita, and request for her to be released on probation so we can get her the help and attention she needs in order to be a more productive positive human being in the world. She is well aware of the wrong that she did and is committed to and well on the way towards repaying all the funds taken back to the U.S. Government.

Gambling is an addiction/disease, and we need to treat the core problem so we can begin the initial steps toward recovery and being cured. Please allow us the opportunity to help treat and begin the healing process in an environment that will support her spiritual, mental, physical and emotional needs.

As these letters reflect, Ms. Ferrer is a fundamentally honest, caring, hardworking, and honorable person who has dedicated her life to service and positively impacted those around her.

The anomalous bad act reflected in her criminal plea, while serious, should not overshadow Ms. Ferrer's otherwise law-abiding and honorable life as the Court considers the appropriate sentence to impose.



Section 5H1.6 of the Sentencing Guidelines (Policy Statement on "Family Ties and Responsibilities") recognizes the Court's discretion to grant a downward Guidelines departure if the defendant's service of a sentence within the applicable guidelines range would cause a loss of essential caretaking or financial support to the defendant's family. The Court's focus should be on the "effect of the defendant's absence on [his] family members." *United States v. Schroeder*, 536 U.S. 746, 756 (7th Cir. 2008) (citing *United States v. Johnson*, 964 F.2d 124, 129 (2nd Cir. 1992) ("The rationale for a downward departure here is not that [the defendant's] family circumstances decrease her culpability, but that we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing.")).



*iv.    Ms. Ferrer's role in supporting her family*

As described above, Ms. Ferrer has financially and/or physically supported many of her family members. In addition to financially and physically supporting her daughter, granddaughter, and mother, Ms. Ferrer has also supported her younger sister and brother and her niece and two nephews. Ms. Ferrer paid for her younger sister to complete nursing school back in the Philippines and has financially supported her younger brother and paid for his three children to go to college in the Philippines. One of Ms. Ferrer's nephews is now an engineer, and her niece is a teacher. Ms. Ferrer was fully paying for her second nephew's medical school in the Philippines but had to stop paying after she was incarcerated on June 2, 2025. While supporting her nephew's medical school only costs approximately $800 per month, Ms. Ferrer's family has limited financial resources and

was greatly benefiting from her support. The Court should also consider this support when determining the appropriate sentence in this case. *See* Section 5H1.6 of the Sentencing Guidelines (Policy Statement on "Family Ties and Responsibilities")

> v.    *Ms. Ferrer's age and health*

The Court should consider Ms. Ferrer's age and health in determining an appropriate sentence. Ms. Ferrer is currently a 65-year-old, 100%-disabled Navy veteran. The wear and tear on her body from 26 years of service, have left her with work induced migraines, lower-back pain, carpel tunnel syndrome, rheumatoid arthritis, and degenerative arthritis.

Additionally, the Court should consider both the increased cost of incarcerating an individual of Ms. Ferrer's age and health as well as the Bureau of Prisons' apparent inability to provide proper care to aging inmates. The Department of Justice itself has reported that aging inmates (classified as age 50 or older) are substantially more costly to incarcerate than younger inmates:

> We found that this cost differential is driven by increased medical needs, including the cost of medication, for aging inmates. BOP institutions with the highest percentages of aging inmates in their population spent five times more per inmate on medical care ($10,114) than I institutions with the lowest percentage of aging inmates ($1,916). BOP institutions with the highest percentages of aging inmates also spent 14 times more per inmate on medication ($684) than institutions with the lowest percentage ($49).

*See* Department of Justice, Office of the Inspector General, *Report on the Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, at ii (May 2015).

In addition to its cost findings, the investigation also revealed that the BOP (1) does not have the appropriate level of staff to meet the needs of its aging population, (2) is not physically equipped to house elderly inmates, and (3) does not provide adequate programming opportunities for aging inmates. Moreover, the report concluded that aging inmates commit far less misconduct, have lower risks of recidivism and that, if not for BOP policy limitations, would be viable

candidates for early release from prison. *See id*. at i-iii. The government will bear a higher cost and burden to incarcerate Ms. Ferrer, and it appears from the Department of Justice's report that the increased costs still will not necessarily ensure that Ms. Ferrer's needs will be met.  *See* 18 U.S.C. § 3553(a)(2)(D) (requiring the Court to consider the defendant's need for "medical care . . . in the most effective manner").

Ms. Ferrer's law-abiding life and years of service to the federal government, ███████ ████████████████████████████ and her own age and health all support a sentence of time served combined with a period of supervised release conditioned on addiction treatment.

### C.  The Need To Avoid Unwarranted Sentencing Disparity

A sentence of time served combined with a period of supervised release would not create unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

As an initial point, as explained in the PSR,

> [d]uring the last five fiscal years (FY2020-2024), there were 498 defendants whose primary guidelines was §2B1.1, with a Final Offense Level of 15 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure . . . For all 498 defendants in the cell, the average sentence imposed was 10 month(s) and the median sentence imposed was 12 month(s).

ECF 20 at paragraph 123. Importantly, 163 (or 33%) of those defendants were not sentenced to any imprisonment. *Id*.

Ms. Ferrer's 108 days of incarceration in DC Jail as a 65-year-old veteran with no criminal history are in line with (if not more serious than) the sentences received by many of these defendants. Notably, the conditions that Ms. Ferrer endured during her 108 days of pre-sentence incarceration are multitudes worse than the conditions of a minimum-security BOP camp.

A sentence of time served combined with a period of supervised release would fall in line with sentences imposed on similar, if not more serious, offenders, especially after taking into account the role Ms. Ferrer's gambling addiction played in this offense as well as her law-abiding life and over three decades of service to the federal government, ████████████████████ ████████████████████

### D.  The Need To Provide Restitution To Victims

Finally, the need to provide restitution to the victim in this case supports time served combined with a period of supervised release. Ms. Ferrer feels strongly about making restitution. Ms. Ferrer had hoped to make full restitution prior to her sentencing. However, due in part to her current incarceration in DC Jail and the added difficulty of trying to sell residential properties while they have current tenants, Ms. Ferrer could not liquidate her assets in time to pay the restitution prior to sentencing. If released, Ms. Ferrer, through counsel, will work with the Government to expedite the sale of her assets with the hope and expectation of making full restitution.  A time served sentence will allow Ms. Ferrer to focus her efforts on making full restitution in this case.

### III.    A SENTENCE OF TIME SERVED COMBINED WITH A PERIOD OF SUPERVISED RELEASE CONDITIONED ON ADDICTION TREATMENT AND RESTITUTION WILL SERVE THE PURPOSES OF FEDERAL SENTENCING

As noted earlier, Congress has identified four purposes of federal sentencing that must guide district courts in selecting a sentence within the statutory penalty range.  The sentence must be "sufficient but not greater than necessary" to serve those purposes which are, in brief, to promote just punishment, deterrence, protection of the public, and rehabilitation.  With these guideposts in mind, we respectfully submit that a sentence of time served followed by a period of

supervised release conditioned upon restitution and continuation and completion of gambling addiction treatment fully serves the purposes of federal sentencing.

Ms. Ferrer acknowledges that she must suffer consequences for her criminal conduct. At the time of sentencing, Ms. Ferrer will have spent 108 days incarcerated at DC Jail as a 65-year-old woman with no criminal history. The conditions that Ms. Ferrer experienced during this time are far worse than the conditions of a minimum-security BOP camp.  Ms. Ferrer has already been punished for her conduct.

A sentence of time served combined with a period of supervised release conditioned on addiction treatment is further supported by the mitigating circumstances of Ms. Ferrer's debilitating gambling addiction, Ms. Ferrer's 26 years of service with the United States Navy and 10 years of service as a civilian for the Department of State, ███████████████████████, and her own health conditions. The requested sentence adequately reflects the seriousness of the offense, promotes respect for the law, and provides just punishment.

The public does not need any further protection from Ms. Ferrer, nor is there reason to believe she will reoffend. Ms. Ferrer's crime was motivated by her gambling addiction. At 65 years old, Ms. Ferrer is retired and committed to receiving the help she needs to combat her addiction and to change her life going forward. On April 14, 2025, Ms. Ferrer enrolled in therapy sessions with a Licensed Clinical Professional Counselor, Amanda Cornaglia. Ms. Cornaglia wrote a letter to the Court describing Ms. Ferrer's diagnosis and treatment:

> Ms. Ferrer was referred to our office through the VA Community Care Program for treatment of a behavioral issue that I diagnosed as (F63.0) Pathological Gambling (also known as Disordered Gambling). The client also meets the diagnostic criteria for (F33.2) Major depressive disorder, recurrent severe without psychotic features and (F41.1) Generalized anxiety disorder.

I met with the client via telehealth and she arrived on time for each of her sessions. The client was engaged in session and was forthcoming in discussing her behaviors, symptoms, and concerns. She spoke openly about her difficulties in changing her thoughts and behaviors and controlling her gambling, as well as a strong desire to change. We used Cognitive Behavioral Therapy interventions to begin to identify behaviors she wanted to change, the possible root causes for the thoughts and behaviors, and the challenges she anticipated in making changes. We also addressed her reported feelings of guilt and shame and utilized Acceptance and Commitment Therapy interventions to come to terms with the severity of her actions and the likely consequences she may face. The client was honest in session about recent relapses in this behavior.

She was actively engaged in treatment until our sessions ended at the time she was taken into custody. Ms. Ferrer was able to identify her negative cognitions, begin opening up about her issues with her family, and identify the new behaviors she wanted to incorporate in her life moving forward.

Letter by Amanda Cornaglia, attached as Attachment 4.

As the Court is aware, Ms. Ferrer has had setbacks. She relapsed into her gambling addiction and violated her conditions of release during a deeply dark period immediately following her plea hearing. As a result of the violation, the Court revoked Ms. Ferrer's bond. In the days following the plea hearing when these violations occurred, Ms. Ferrer was too ashamed to even tell her family or friends, including her husband, about her conduct and the fact that she had pled guilty to a federal crime. Her shame and isolation drew her back into the addiction that has upended her life. Ms. Cornaglia writes about the prevalence of relapse in cases of gambling addiction: "Reputable studies on gambling addiction report relapse rates of anywhere from 45-90% and this condition requires extensive commitment from the client and continued engagement in therapy, bolstered by a strong support system." *Id*.

This relapse occurred several weeks after Ms. Ferrer enrolled in behavioral therapy through the Department of Veterans Affairs and in Gamblers Anonymous group meetings. Further in the days after Ms. Ferrer relapsed, she signed up for the Maryland, Virginia, West Virginia, and New Jersey's Voluntary Exclusion Programs (or "VEPs"). VEPs are a way for people who have a

gambling problem to voluntarily ban themselves from participating in any gambling activities in a state. Most states that have legalized gambling have also established VEPs with differing requirements to help problem gamblers abstain from the activity. When you sign up for a state's VEP, casinos in that state will not let you enter during your period of enrollment in the state's VEP. These programs will help Ms. Ferrer as she continues to combat her gambling addiction by preventing her from entering casinos in any of these states.

Ms. Ferrer's need for continued treatment further supports a sentence of time served combined with a period of supervised release. As Ms. Cornaglia writes in her letter:

> It is my recommendation that Ms. Ferrer continue therapeutic services to address continued engagement in gambling behaviors despite adverse consequences, increase self-control over the gambling behavior, and manage her urges to engage in gambling. Concurrent work on addressing her symptoms of depression and anxiety will also benefit her work on her addictive behavior. These services can be provided in a combination of regular weekly outpatient sessions and support group meetings designed specifically for people with gambling addictions. Ms. Ferrer has these services available to her, free of charge, through the programs provided by the Department of Veterans Affairs.

*Id*. *See* U.S.C. § 3553(a)(2)(D) (requiring the Court to consider the defendant's need for "medical care, or other correctional treatment in the most effective manner").

Ms. Ferrer is at low risk of reoffending based on available empirical evidence. According to the United States Sentencing Commission, a Criminal History Category I offender over the age of 50, like Ms. Ferrer, has a historical general recidivism rate of 6.2%, which is the lowest reported recidivist rate in the Commission's study.[4] Further, females in Criminal History Category I have a

---

4 *See* U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 28 Ex. 9 (2004) (listing the recidivism rates for various types of offenders and considering demographics such as gender, age, race, drug use, marital status, etc.), available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

significantly lower risk of recidivism across all ages than males in Criminal History Category I (10% for females vs 15.2% males across all age groups).

Moreover, Ms. Ferrer has already faced serious consequences for her conduct. At the time of sentencing, Ms. Ferrer will have spent close to four months incarcerated in DC Jail. She lost her job with the Department of State. She will never be able to work as a public servant for the United States again -- work she was passionate about and proud of. Going forward, she will face all the stigma and consequences that accompany a felony conviction. Her family, many of her close friends, and members of the community are aware of these charges, and she is still coping with how to interact with the community. Ms. Ferrer is ashamed and embarrassed about her conduct and the impact it has had on those she loves. These consequences provide sufficient specific deterrence.

Although general deterrence remains a required consideration under § 3553(a), there is little evidence to support a finding that harsh sentences deter future criminal conduct. The unique combination of motivation and circumstances that lead otherwise law-abiding citizens to risk prosecution and imprisonment are not so easily overcome by the simple imposition of lengthy sentences. While such a theory might be appealing on its face, the reality is that there is little to no difference in the deterrent effect between probation and imprisonment.[5] Indeed, available research

---

[5] *See* Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 PRISON J. 48S, 50S-51S (2011) (according to "the best available evidence…prisons do not reduce recidivism more than noncustodial sanctions"); *see also* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) ("increases in severity of punishments do not yield significant (if any) marginal deterrent effects.").

suggests that the certainty of being caught and punished carries for greater deterrent effect than the severity of the punishment.[6]

## CONCLUSION

For the foregoing reasons and any other that may appear to the Court or that may develop at the sentencing hearing, Ms. Ferrer asks this Court to sentence her to time served combined with a period of supervised release conditioned on addiction treatment and restitution.

Respectfully submitted,

/s/ Noah Cherry
David Schertler (No. 367203)
Noah Cherry (No. 1742964)
Schertler Onorato Mead & Sears, LLP.
555 13th Street, N.W., Suite 500 West
Washington, D.C.  20004
Telephone:  (202) 628-4199
dschertler@schertlerlaw.com
ncherry@schertlerlaw.com

*Counsel for Levita Ferrer*

---

[6] *See* David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes, 33 CRIMINOLOGY 587 (1995); see also Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime, 8 CARDOZO J. CONFLICT RESOL. 421, 448-49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."); *see also* Symposium, U.S.S.C., Federal Sentencing Policy for Economic Crimes and New Technology Offenses, Plenary Session I, "What Social Science Can Contribute to Sentencing Policy for Economic Crimes," at 22 (Oct. 12, 2000) ("One consistent finding in the deterrent literature is that the certainty rather than the severity of punishment seems to be the most effective    deterrent."),    available    at    http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/economic-crimes/20001012-symposium/cPlenaryI.pdf.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 11th day of September 2025, I electronically filed a true copy of the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all parties.

/s/ Noah Cherry
Noah Cherry (No. 1742964)
